## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **ADAM JOSHUA BOEY**<br>5007 Forest Land Court<br>Brunswick, OH  44212 | CASE NO.<br><br>JUDGE |
| Plaintiff, | |
| v. | |
| **BRUNSWICK HILLS TOWNSHIP**<br>1918 Pearl Road<br>Brunswick, OH  44212 | |
| and | |
| **CITY OF BRUNSWICK**<br>4095 Center Road<br>Brunswick, OH  44212 | |
| and | |
| **PRZEMYSLAW PIEKUT**<br>c/o Brunswick Hills Police Department<br>505 Substation Road<br>Brunswick Hills, OH  44212 | |
| and | |
| **THEODORE A. MAKRINOS**<br>c/o Brunswick Hills Police Department<br>505 Substation Road<br>Brunswick Hills, OH  44212 | |
| and | |
| **DAREN LUBINSKY**<br>c/o Brunswick Police Department<br>4095 Center Road<br>Brunswick, OH  44212 | |
| **and** | |

**JONATHAN A. OSBORNE**
c/o Brunswick Police Department
4095 Center Road
Brunswick, OH  44212

          Defendants.

---

### COMPLAINT
### (Jury Demand Endorsed Herein)

---

Adam Joshua Boey, by and through undersigned counsel, states as follows for his Complaint against the Defendants:

### <u>NATURE OF THE ACTION</u>

1.      On February 4, 2023, Adam Joshua Boey stopped at a store near his home in Brunswick Hills Township, Ohio. While Mr. Boey was in the store, Defendant Przemyslaw Piekut, a white police officer for the Brunswick Hills Police Department, approached Mr. Boey from behind and told Mr. Boey that he was under arrest and to put his hands behind his back.

2.      At the time of the unlawful encounter with Mr. Boey, officers for both the Brunswick Hills Police Department and the Brunswick Police Department were in pursuit of a 47-year-old white male fugitive described as 5'9" and as having a brown goatee. Mr. Boey, a 33-year-old man of Cherokee and Black decent who is a 5'11" and who did not have a goatee, did not fit the fugitive's description in even the most remote sense, and there was no suspicion of his involvement in any crime.

3.      Nonetheless, Defendant Piekut and other officers wrongfully stopped and searched Mr. Boey, wrongfully seized Mr. Boey's wallet, and wrongfully arrested Mr. Boey with no legitimate basis for their conduct.  In doing so, the officers violated Mr. Boey constitutional rights, causing Mr. Boey to suffer mental anguish, emotional distress, and humiliation.

4.     Mr. Boey, a former police officer himself, criticized the officers' unlawful actions during the encounter. The officers retaliated by unjustifiably extending Mr. Boey's detainment and/or arrest, despite having discovered exculpatory evidence via an unlawful search of Mr. Boey's person.

5.     After the incident, Mr. Boey contacted the Brunswick Hills Police Department to request public records related to his encounter with the officers on February 4, 2023, including the officers' body cam footage. Shortly thereafter, Defendant Piekut commenced a campaign of harassment against Mr. Boey in an effort to chill Mr. Boey from continuing to pursue such records.

6.     By this action, Mr. Boey seeks redress for violations of his rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983.

## **PARTIES**

7.     Plaintiff Adam Joshua Boey ("Plaintiff"), a man of Cherokee and African American descent, is a United States Army veteran and former SWAT Team Police Officer with severe, chronic post-traumatic stress disorder ("PTSD") following military combat. Plaintiff was 33 years old at the time of the incident giving rise to this action and, at all times relevant hereto, was and is a resident of Medina County, Ohio.

8.     Defendant Brunswick Hills Township is a political subdivision of the State of Ohio, which operates, oversees, and manages the Brunswick Hills Police Department ("BHPD").

9.     Defendant Przemyslaw Piekut ("Piekut") is, and at all relevant times was, a sergeant with the BHPD. In doing the things herein alleged, Defendant Piekut was acting under the color of state law and in the course and scope of his employment with Defendant Brunswick Hills Township. Defendant Piekut is sued in his individual capacity.

3

10.    Defendant Theodore A. Makrinos ("Makrinos") is, and at all relevant times was, a K-9 unit officer with the BHPD. In doing the things herein alleged, Defendant Makrinos was acting under the color of state law and in the course and scope of his employment with Defendant Brunswick Hills Township.  Defendant Makrinos is sued in his individual capacity.

11.    Defendant City of Brunswick is a political subdivision of the State of Ohio, which operates, oversees, and manages the Brunswick Police Department ("BPD").

12.    Defendant Daren Lubinsky ("Lubinsky") is, and at all relevant times was, a sergeant with the BPD.  In doing the things herein alleged, Defendant Lubinsky was acting under the color of state law and in the course and scope of his employment with Defendant City of Brunswick. Defendant Lubinsky is sued in his individual capacity.

13.    Defendant Jonathan A. Osborne ("Osborne") is, and at all relevant times was, an officer with the BPD.  In doing the things herein alleged, Defendant Osbourne was acting under the color of state law and in the course and scope of his employment with Defendant City of Brunswick.  Defendant Osborne is sued in his individual capacity.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to 28 because it arises under the Constitution and laws of the United States, as it is being brought to obtain compensatory and punitive damages for the deprivation, under color of state law, of the rights of citizens of the United States that are secured by the United States Constitution, pursuant to 42 U.S.C. § 1983.

15.    This Court is the proper venue pursuant to 28 U.S.C. § 1391(b)(2) because the conduct and events giving rise to the claims for relief arose in Medina County, Ohio.

4

## FACTUAL ALLEGATIONS

16.     On February 4, 2023, the BPD received a notification from their Flock camera system that a 2002 Jeep automobile with Ohio Registration No. JOC6690 (the "Jeep") was traveling south on Pearl Road at Oxford Drive.

17.     The registered owner of the Jeep is Ronald Ray Varner ("Varner"), who had outstanding warrants for burglary and shoplifting. The Jeep had also been involved in a pursuit with the BPD on November 18, 2022; however, it is unknown who was driving the Jeep at that time.

18.     Defendant Osborne located the Jeep in a parking lot (the "Parking Lot") at the Laurel Square Shopping Center (the "Shopping Center"). The Jeep was parked and unoccupied at the time it was located.

19.     Defendants Piekut, Lubinsky, Osborne, and Makrinos did not see Varner in the Parking Lot and did not speak with anyone who claimed to have seen Varner in the Parking Lot or at the Shopping Center.

20.     The Defendants had a photograph of Varner (the "Photograph") which showed Varner with a goatee.

21.     The Defendants also knew that Varner was a 47-year-old white male, that Varner was 5'9" tall, and that Varner had a brown goatee.

22.     The Defendants did not have a description of Varner's clothing to rely on for purposes of identifying Varner.

23.     At approximately 9:05 A.M. (EST), Defendant Osborne positioned himself near the entrance to a Discount Drug Mart located at 1637 Pearl Road, Brunswick, Ohio 44212 (the "Drug Mart"). The Drug Mart is part of the Shopping Center surrounding the Parking Lot.

5

24.     Between approximately 9:05 A.M. (EST) and 9:21 A.M. (EST), Defendant Osborne examined customers entering and exiting the Drug Mart to determine if any such customers matched Varner's photograph or description.

25.     Between approximately 9:05 A.M. (EST) and 9:21 A.M. (EST), Defendants Lubinsky, Piekut and Makrinos watched the entrance to the Drug Mart from their respective vehicles. During that time, Defendants Lubinsky, Piekut and Makrinos examined customers entering and exiting the Drug Mart to determine if any such customers matched Varner's photograph or description.

26.     At approximately 9:06 A.M. (EST), a white male with a goatee exited the Drug Mart and started walking around the Parking Lot. The man was wearing a tan sweatshirt with the hood up, making it difficult to see his face clearly.

27.     At approximately 9:07 A.M. (EST) Defendant Lubinsky radioed the other Defendants about the man in the tan sweatshirt, stating that he found the man's behavior odd and asking the other Defendants to get a closer look.

28.     Without moving closer to the man in the tan sweatshirt, Defendant Osbourne immediately radioed back that the man's goatee was grey and that the man looked a little taller than 5'9".

29.     Despite Defendant Lubinsky's suspicion that the man in the tan sweatshirt might be Varner, the Defendants did not try to get a closer look at the man, let alone question, detain, or arrest him. Rather, because the man (i) had a grey goatee (and not a brown goatee), and (ii) looked a little taller than 5'9" (and not 5'9" exactly), the Defendants concluded that the man must not be Varner.

30.     At approximately 9:15 A.M. (EST), Plaintiff arrived at the Parking Lot and parked his truck near the Drug Mart.  The parking spot where Plaintiff parked his truck was visible to the Defendants.

31.     At approximately 9:19 A.M. (EST), Plaintiff walked past Defendants Osborne, Lubinsky, Piekut and Makrinos, and entered the Drug Mart.  At that time, none of the Defendants said anything to Plaintiff and none of the Defendants said anything about Plaintiff over the Defendants' shared radio transmissions.

32.     At approximately 9:21 A.M. (EST), Defendants Piekut, Makrinos, and Osbourne entered the Drug Mart to search for Varner.

33.     While in the Drug Mart, Defendants Piekut, Makrinos, and Osbourne showed the Photograph to several employees and customers.  Each time, Defendants Piekut, Makrinos, and Osbourne reiterated that Varner (i) is a white male; (ii) is 5'9"; (iii) is 47 years old; and (iv) has a brown goatee.

34.     At approximately 9:22 A.M. (EST), Plaintiff waived hello to Defendants Makrinos and Osborne as Plaintiff walked past them in the Drug Mart.  Defendants Makrinos and Osborne did not stop Plaintiff, say anything about Plaintiff or watch Plaintiff as he walked away.  Rather, Defendants Makrinos and Osborne walked past Plaintiff and continued searching the Drug Mart for someone matching Varner's photograph and description.

35.     At approximately 9:23 A.M. (EST), Defendant Piekut radioed for backup and stated he was arresting Plaintiff.

36.      Immediately thereafter, Defendant Piekut approached Plaintiff and told Plaintiff that he was under arrest and to put his hands behind his back.  After Plaintiff complied, Defendant Piekut walked Plaintiff into a store aisle and put Plaintiff in handcuffs.

37.     As Defendant Piekut was putting Plaintiff in handcuffs, Plaintiff told Defendants that they had the wrong guy and that he had not done anything wrong.

38.     Defendant Piekut stood behind Plaintiff at one end of the aisle while Defendant Makrinos and the K-9 stood in front of Plaintiff blocking the other end of the aisle.

39.     While Plaintiff was in handcuffs, Defendant Piekut asked Plaintiff where Plaintiff had his wallet. Plaintiff indicated that his wallet was in the back pocket of his pants. Without asking for Plaintiff's consent, Defendant Piekut reached into the pocket of Plaintiff's pants and seized Plaintiff's wallet.

40.     Defendant Piekut did not, at any time relevant hereto, seek Plaintiff's consent to be searched.

41.     Plaintiff did not, at any time relevant hereto, explicitly or implicitly, consent to being searched.

42.     Defendant Piekut did not, at any time relevant hereto, ask Plaintiff if he was armed.

43.     Defendant Piekut did not pat down Plaintiff's clothing, frisk Plaintiff or otherwise conduct a protective search of Plaintiff's person prior to searching Plaintiff's pocket and seizing Plaintiff's wallet.

44.     After seizing Plaintiff's wallet, Defendant Piekut began searching through the contents of Plaintiff's wallet. Defendant Piekut found Plaintiff's military identification card (the "Military I.D."), which: (i) shows a picture of Plaintiff; (ii) states Plaintiff's name: Adam Joshua Boey; and (iii) provides Plaintiff's date of birth: April 16, 1989.

45.     After examining the information on the Military I.D., Defendant Piekut continued searching the contents of Plaintiff's wallet. Defendant Piekut also continued interrogating Plaintiff, asking Plaintiff why he was driving the Jeep.

46. While being interrogated, Plaintiff began to loudly criticize the Defendants, stating that he had worked as a police officer for the past six years and that the Defendants had a responsibility to do better police work.  Plaintiff also informed the Defendants that he is a disabled war veteran.

47. Notwithstanding Plaintiff's protests, Defendant Piekut continued searching Plaintiff's wallet and found Plaintiff's driver's license (the "License").  Like the Military I.D., Plaintiff's License shows a picture of Plaintiff, states Plaintiff's name, and sets forth Plaintiff's date of birth.  Plaintiff's License also lists Plaintiff's height as 5'11" and provides Plaintiff's home address.

48. The Military I.D. and License undoubtedly demonstrated that Plaintiff was not Varner.  Despite learning that no reasonable suspicion existed to detain Plaintiff (much less probable cause to arrest), Defendants Piekut and Makrinos did not immediately release Plaintiff from their custody.  Instead, Defendants Piekut and Makrinos left Plaintiff in handcuffs while Defendant Piekut radioed dispatch to check for existing warrants.

49. After the warrant check came back negative, Defendants finally released Plaintiff from their custody.

50. Upon leaving the Drug Mart, Plaintiff began experiencing a panic attack and contacted the Veterans Crisis Line for help.  The responder noted that Plaintiff was having difficulty expressing himself and exhibited labored breathing on their call.

51. Plaintiff continued to suffer from a panic attack following his call with the Veterans Crisis Line.  As a result, Plaintiff went to the emergency room where he received treatment for his panic attack, as well as for injuries to his wrists caused by the handcuffs.

52.     As a result of the Defendants' actions, Plaintiff suffered a deprivation of his rights and liberties, and suffered mental anguish, emotional distress and humiliation.

53.     On March 2, 2023, Plaintiff sent an email to the BHPD Chief of Police, Tim Sopkovich ("Sopkovich") requesting public records related to the Defendants unlawful actions on February 4, 2023, including the body cam footage for Defendants' Piekut and Makrinos.

54.     Nine days later, on March 11, 2023, Plaintiff noticed Defendant Piekut sitting in a BHPD vehicle that was parked across the street from Plaintiff's home. Plaintiff feared that Defendant Piekut (i) had obtained Plaintiff's home address when unlawfully searching the contents of Plaintiff's wallet, and (ii) intended to retaliate against Plaintiff for requesting Defendant Piekut and Makrinos' body cam footage.

55.     After watching the BHPD vehicle for some time, Plaintiff went out on his porch and started recording the vehicle with his phone. Shortly thereafter, Defendant Piekut exited the BHPD vehicle and approached Plaintiff's home.

56.     Defendant Piekut questioned Plaintiff about a Kia sedan (the "Kia") that was parked in the street near Plaintiff's home. Plaintiff informed Defendant Piekut that he did not own the Kia or know anything about the Kia, including who owned the Kia or who parked the Kia in the street.

57.     Thereafter, Plaintiff asked if Defendant Piekut remembered him from the events in the Drug Mart on February 4, 2023. Defendant Piekut admitted that he remembered Plaintiff, but quickly walked away – seemingly because he realized Plaintiff was filming the interaction.

58.     Finding Defendant Piekut's visit unfounded and, indeed, alarming, Plaintiff went to each of his neighbors' homes and asked if they had been approached by Defendant Piekut. None of Plaintiff's neighbors had spoken with or been approached by Defendant Piekut about the Kia or

otherwise. Upon information and belief, Plaintiff is the only person whom Defendant Piekut questioned about the Kia on March 11, 2023.

59.     On March 15, 2023, Plaintiff again noticed a BHPD vehicle driven by Defendant Piekut parked in front of his home.

60.     Thereafter, Plaintiff covered every window on the front of his home with blankets to prevent Defendant Piekut from spying into Plaintiff's home.  Plaintiff also installed alarms on the doors of his home, fearing that Defendant Piekut's efforts to intimidate and harass Plaintiff might escalate.

61.     As a result of Defendant Piekut's actions on March 11th and March 15th of 2023, Plaintiff suffered further mental anguish and emotional distress.

62.     On August 18, 2023, Plaintiff was at Tony K's Bar and Grille located at 841 Bagley Road, Berea, Ohio 44017 when he was approached by Defendant Makrinos.  Defendant Makrinos recognized Plaintiff from the Drug Mart incident on February 4, 2023.

63.     Defendant Makrinos informed Plaintiff that Defendants Piekut, Makrinos and Osborne knew that Plaintiff was not Varner when Defendant Piekut and other officers wrongfully stopped and searched Mr. Boey, wrongfully seized Mr. Boey's wallet, and wrongfully arrested Mr. Boey.  Rather, Defendant Makrinos told Plaintiff that Defendant Piekut is a "dick" and just wanted to mess with Plaintiff.

64.     Defendant Makrinos also told Plaintiff that Plaintiff needed to watch his mouth, referring to Plaintiff's statements on February 4, 2023, criticizing the Defendants' policework.

65.     On November 2, 2023, Plaintiff was jogging in Brunswick Hills when he saw Defendant Piekut drive past in his BHPD vehicle. Immediately after passing by Plaintiff,

11

Defendant Piekut performed an illegal U-turn, then drove his vehicle directly at Plaintiff before swerving back towards the road and speeding away.

66.     As a result of Defendant Piekut's actions on November 2, 2023, Plaintiff suffered further mental anguish and emotional distress.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fourth Amendment: Unlawful Detainment
### (Against Defendants Piekut, Osborne, and Makrinos)

67.     Plaintiff incorporates by reference all allegations contained in the preceding paragraphs as though expressly set forth herein.

68.     All of the actions taken by Defendants Piekut, Osborne and Makrinos and referred to in the preceding allegations were done while acting under color of Ohio law – *i.e.*, investigating a fugitive wanted under state-law warrants – and caused the deprivation of Plaintiff's clearly established constitutional right under the Fourth Amendment of the United States Constitution to be free from detention without reasonable suspicion.

69.     Defendants Piekut, Makrinos and Osborne's actions were intentional, knowing, malicious, undertaken in bad faith, and/or in gross and reckless disregard of Plaintiff's constitutional rights.

70.     Defendant Piekut detained Plaintiff for purposes of the Fourth Amendment by placing Plaintiff in handcuffs.

71.     By assisting Defendant Piekut, Defendants Makrinos and Osborne, also violated Plaintiff's clearly established constitutional right to be free from detention without reasonable suspicion.

72.     Defendants Piekut, Makrinos and Osborne did not have reasonable suspicion to detain Plaintiff.

73.     Plaintiff bears no resemblance to Varner's Photograph and does not reasonably fit the description of Varner available to the Defendants at the time of the detainment.

74.     Defendant Makrinos informed Plaintiff that the Defendants knew that Plaintiff was not Varner at the time of detainment.

75.     As a direct and proximate result of Defendants Piekut, Osborne and Makrinos' actions and omissions described above, Plaintiff's constitutional rights were violated, causing significant injuries and damages to Plaintiff and entitling him to relief under 42 U.S.C. § 1983.

76.     As a result of Defendants Piekut, Osborne and Makrinos' unlawful detainment of Plaintiff, Plaintiff suffered mental anguish, emotional distress and humiliation.

77.     Plaintiff seeks all relief allowed by law, including compensatory damages, punitive damages, and reasonable attorney fees.

<u>**SECOND CAUSE OF ACTION**</u>
**42 U.S.C. § 1983 – Fourth Amendment: Unlawful Search and Seizure**
**(Against Defendants Piekut, Osborne, and Makrinos)**

78.     Plaintiff incorporates by reference all allegations contained in the preceding paragraphs as though expressly set forth herein.

79.     All of the actions taken by Defendants Piekut, Osborne and Makrinos and referred to in the preceding allegations were done while acting under color of Ohio law – *i.e.*, investigating a fugitive wanted under state-law warrants – and caused the deprivation of Plaintiff's clearly established constitutional rights under the Fourth Amendment of the United States Constitution, including Plaintiff's (i) right to be free from unreasonable searches, and (ii) right to be free from unreasonable seizures of his property.

80.     Defendants Piekut, Makrinos and Osborne's actions were intentional, knowing, malicious, undertaken in bad faith, and/or in gross and reckless disregard of Plaintiff's constitutional rights.

13

81. Defendant Piekut violated Plaintiff's right to be free from illegal search by searching Plaintiff's person without reasonable suspicion that Plaintiff was armed, without probable cause of criminality, and not incident to lawful arrest.

82. Prior to searching Plaintiff's person, Defendant Piekut did not ask Plaintiff for consent, did not ask if Plaintiff was armed, and did not frisk Plaintiff or otherwise conduct a protective search of Plaintiff's person. Further, Plaintiff did not, at any time relevant hereto, explicitly or implicitly, consent to being searched.

83. Defendant Piekut violated Plaintiff's right to be free from illegal seizures of his property by seizing Plaintiff's wallet in the course of an illegal search of Plaintiff's person.

84. Defendant Piekut further violated Plaintiff's right to be free from illegal search by searching Plaintiff's wallet, which was unlawfully seized from Plaintiff via an illegal search of Plaintiff's person.

85. By assisting Defendant Piekut, Defendants Makrinos and Osborne, also violated Plaintiff's clearly established constitutional right to be free unreasonable searches and seizures.

86. As a direct and proximate result of Defendants Piekut, Osborne and Makrinos' actions and omissions described above, Plaintiff's constitutional rights were violated, causing significant injuries and damages to Plaintiff and entitling him to relief under 42 U.S.C. § 1983.

87. As a result of Defendants Piekut, Osborne and Makrinos' unlawful search of Plaintiff's person and wallet, and unlawful seizure of Plaintiff's wallet, Plaintiff suffered mental anguish, emotional distress and humiliation.

88. Plaintiff seeks all relief allowed by law, including compensatory damages, punitive damages, and reasonable attorney fees.

### THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fourth Amendment: Unlawful Arrest

**(Against Defendants Piekut, Osborne, and Makrinos)**

89.     Plaintiff incorporates by reference all allegations contained in the preceding paragraphs as though expressly set forth herein.

90.     All of the actions taken by Defendants Piekut, Osborne and Makrinos and referred to in the preceding allegations were done while acting under color of Ohio law – *i.e.*, investigating a fugitive wanted under state-law warrants – and caused the deprivation of Plaintiff's clearly established constitutional right under the Fourth Amendment of the United States Constitution to right to be free from arrest without probable cause.

91.     Defendants Piekut, Makrinos and Osborne's actions were intentional, knowing, malicious, undertaken in bad faith, and/or in gross and reckless disregard of Plaintiff's constitutional rights.

92.     Defendant Piekut arrested Plaintiff for purposes of the Fourth Amendment by placing Plaintiff in handcuffs, moving Plaintiff to a secondary location, and telling Plaintiff that he was under arrest.

93.     Defendants Piekut, Makrinos and Osborne did not have probable cause to arrest Plaintiff.

94.     Plaintiff bears no resemblance to Varner's Photograph and does not reasonably fit the description of Varner available to the Defendants at the time of the arrest.

95.     Defendant Makrinos informed Plaintiff that the Defendants knew that Plaintiff was not Varner at the time of the unlawful arrest.

96.     By assisting Defendant Piekut, Defendants Makrinos and Osborne, also violated Plaintiff's clearly established constitutional right to be free from arrest without probably cause.

15

97.     As a direct and proximate result of Defendants Piekut, Osborne and Makrinos'
actions and omissions described above, Plaintiff's constitutional rights were violated, causing
significant injuries and damages to Plaintiff and entitling him to relief under 42 U.S.C. § 1983.

98.     As a result of the Defendants Piekut, Osborne and Makrinos' unlawful arrest
without probable cause, Plaintiff suffered mental anguish, emotional distress and humiliation.

99.     Plaintiff seeks all relief allowed by law, including compensatory damages, punitive
damages, and reasonable attorney fees.

**FOURTH CAUSE OF ACTION**
**42 U.S.C. § 1983 – FIRST AMENDMENT**
**(Against Defendants Piekut, Osborne, and Makrinos)**

100.    Plaintiff incorporates by reference all allegations contained in the preceding
paragraphs as though expressly set forth herein.

101.    By the actions and omissions described above, Defendants Piekut, Osborne and
Makrinos, acting under color of law, caused the deprivation of Plaintiff's clearly established right
under the First Amendment of the U.S. Constitution to engage in protected speech free from
retaliation.

102.    Plaintiff engaged in constitutionally protected speech when he made statements
criticizing the Defendants' policework while Defendant Piekut was unlawfully searching
Plaintiff's person.

103.    In response to Plaintiff's comments, Defendants Piekut, Osborne, and Makrinos
unreasonably extended Plaintiff's detainment and/or arrest, despite having discovered exculpatory
evidence – *i.e.*, Plaintiff's Military I.D. and License.

16

104.     As a result of Defendants Piekut, Osborne and Makrinos' unreasonable extension of Plaintiff's detainment and/or arrest, Plaintiff suffered mental anguish, emotional distress and humiliation.

105.     The mental anguish, emotional distress and humiliation suffered by Plaintiff as a result of the Defendants' retaliatory conduct was sufficient to chill a person of ordinary firmness from criticizing the conduct of police officers during a detainment or arrest.

106.     Defendants Piekut, Osborne, and Makrinos' retaliatory conduct so chilled Plaintiff that immediately after the incident, Plaintiff contacted mental health professionals.

107.     Defendants Piekut, Osborne and Makrinos deprived Plaintiff of his First Amendment rights described herein knowingly, maliciously, and with conscious and reckless disregard for whether the rights of Plaintiff would be violated by their acts and/or omissions. Defendants' acts and/or omissions directly and proximately caused injuries and damages to Plaintiff as set forth above.

108.     Defendants Piekut, Osborne and Makrinos' conduct entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. §1983 and Ohio law in an amount sufficient to punish and deter such conduct.

## FIFTH CAUSE OF ACTION
## 42 U.S.C. § 1983 – FIRST AMENDMENT
### (Against Defendant Piekut)

109.     Plaintiff incorporates by reference all allegations contained in the preceding paragraphs as though expressly set forth herein.

110.     By the actions and omissions described above, Defendant Piekut, acting under color of law, caused the deprivation of Plaintiff's clearly established right under the First Amendment of the U.S. Constitution to engage in protected speech free from retaliation.

111.    On March 2, 2023, Plaintiff contacted the Brunswick Hills Police Department to request footage from the Defendant Piekut and Defendant Makrinos' body cameras.

112.    Plaintiff's public records request was protected speech under the First Amendment.

113.    Upon information and belief, Defendant Piekut was aware that Plaintiff requested public records related to Plaintiff's detainment and arrest at the Drug Mart on February 4, 2023.

114.    On March 11, 2023, Defendant Piekut commenced a campaign of harassment and intimidation against Plaintiff that involved sitting in his BHPD vehicle in front of Plaintiff's home on multiple occasions, approaching Plaintiff at his home, and driving his BHPD vehicle in Plaintiff's direction while Plaintiff was jogging.

115.    Upon information and belief, Defendant Piekut's campaign of harassment and intimidation was motivated by Plaintiff's public records request on March 2, 2023.

116.    Upon information and belief, Defendant Piekut's campaign of harassment and intimidation was intended to chill Mr. Boey from continuing to pursue such records.

117.    Defendant Piekut deprived Plaintiff of his First Amendment rights described herein knowingly, maliciously, and with conscious and reckless disregard for whether the rights of Plaintiff would be violated by their acts and/or omissions. Defendant Piekut's acts and/or omissions directly and proximately caused injuries and damages to Plaintiff as set forth above.

118.    Defendants Piekut's conduct entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. §1983 and Ohio law in an amount sufficient to punish and deter such conduct.

## SIXTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT
### (Against Defendants Piekut, Osborne, Makrinos and Lubinsky)

119.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs as though expressly set forth herein.

120.    All of the actions taken by Defendants Piekut, Osborne, Makrinos and Lubinsky and referred to in the preceding allegations were done while acting under color of Ohio law – *i.e.*, investigating a fugitive wanted under state-law warrants – and caused the deprivation of Plaintiff's clearly established constitutional right under the Fourteenth Amendment of the United States Constitution to right to be free from discriminatory law enforcement.

121.    Plaintiff is of Cherokee and Black descent.

122.    Under the guise of executing an arrest warrant for Varner, Defendants Piekut, Osborne, Makrinos and Lubinsky intentionally discriminated against Plaintiff based on the color of his skin.

123.    Prior to detaining and/or arresting Plaintiff, Defendants Piekut, Osborne, Makrinos and Lubinsky observed a man in a tan sweatshirt exhibiting suspicious behavior in the Parking Lot.  Like Varner, the man was white and had a goatee.

124.    Despite these similarities, Defendants Piekut, Osborne, Makrinos and Lubinsky did not question, stop, detain, or arrest the man in the tan sweatshirt.  In fact, the Defendants did not even attempt to take a closer look at the man's face based on their observation that the man's goatee was grey and he looked a little taller than 5'9".

125.    Plaintiff, a 33-year-old man of Cherokee and Black decent, is 5'11" and *did not* have a goatee when he was unlawfully detained, searched, and/or arrested.

126.    Despite the undeniable fact that the man in the tan sweatshirt was a closer match to the description of Varner than Plaintiff, Defendants Piekut, Osborne, Makrinos and Lubinsky ignored the man, who was white, and instead targeted Plaintiff, a person of color.

127.    Defendants Piekut, Osborne, Makrinos and Lubinsky detained, searched, and arrested Plaintiff because of his race.

128.    Although Defendants Piekut, Osborne and Makrinos knew that Plaintiff was not Varner at the time they detained and/or arrested Plaintiff, the Defendants targeted Plaintiff because Plaintiff is a person of color.

129.    Defendants Makrinos, Osborne, and Lubinsky intentionally discriminated against Plaintiff by assisting Defendant Piekut in the unlawful detainment and/or arrest of Plaintiff and by failing to stop Defendant Piekut's discriminatory conduct.

130.    As a direct and proximate result of Defendants Piekut, Osborne, Makrinos and Lubinsky's actions, Plaintiff suffered mental anguish, emotional distress and humiliation.

131.    Defendants Piekut, Osborne and Makrinos deprived Plaintiff of his clearly established constitutional right under the Fourteenth Amendment be free from discriminatory law enforcement knowingly, maliciously, and with conscious and reckless disregard for whether the rights of Plaintiff would be violated by their acts and/or omissions. Defendants' acts and/or omissions directly and proximately caused injuries and damages to Plaintiff as set forth above.

132.    Defendants Piekut, Osborne and Makrinos' conduct entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. §1983 and Ohio law in an amount sufficient to punish and deter such conduct.

**SEVENTH CAUSE OF ACTION**
**42 U.S.C. § 1983 (*Monell* Liability)**
**(Fourth and Fourteenth Amendment Claims)**
**(Against Defendants Brunswick Hills Township and City of Brunswick)**

133.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs as though expressly set forth herein.

134.    Defendants Brunswick Hills Township and City of Brunswick are liable for the violations of Plaintiff's constitutional rights as described in this Complaint by virtue of their respective (i) official policies and practices, and (ii) ratification of Defendants Piekut, Osborne, and Makrinos' conduct.

135.    The actions of Defendants Piekut and Makrinos were undertaken pursuant to policies, practices, and customs of Brunswick Hills Township and the BHPD, which were approved, encouraged and/or ratified by policymakers for Brunswick Hills Township and the BHPD with final policymaking authority.

136.    The actions of Defendants Piekut and Makrinos were undertaken pursuant to the policy of Defendant Brunswick Hills Township and the BHPD in that the Township and BHPD had inadequate policies, training and supervisions on the following: unlawful detentions without reasonable suspicion; unlawful searches and seizures, unlawful arrests without probable cause; accurate identification of suspects based on photos and/or physical descriptions; continued detention after discovery of exculpatory materials; detention or arrest based on a citizen's exercise of their First Amendment right to criticize and verbally protest the actions of an officer or sergeant; and execution of warrants without racial bias or discrimination, even though the need for such policies, training and supervision was obvious.

137.    Given the frequency with which officers must: determine the existence of reasonable suspicion or probable cause; conduct searches and seizures; handle exculpatory

evidence; identify suspects based on photographs and/or physical descriptions; deal with criticism of their policework; and perform their duties without racial bias or discrimination, the violations of Plaintiff's First, Fourth, and Fourteenth Amendment rights were a highly predictable consequence of a failure to equip BHPD officers and sergeants with the specific tools – including polices, training, and supervision – to handle such recurring situations.

138. Further, upon information and belief, Defendant Brunswick Hills Township learned of Defendants Piekut and Makrinos' conduct and acquiesced to their unlawful conduct. Defendant Brunswick Hills Township essentially ratified the conduct by not taking disciplinary action against them where their conduct had been so clearly unlawful.

139. The actions of Defendants Osborne and Lubinsky were undertaken pursuant to policies, practices, and customs of the City of Brunswick and the BPD, which were approved, encouraged and/or ratified by policymakers for City of Brunswick and the BPD with final policymaking authority.

140. The actions of Defendants Osborne and Lubinsky were undertaken pursuant to the policy of Defendant City of Brunswick and the BPD in that the City and BPD had inadequate policies, training and supervisions on the following: unlawful detentions without reasonable suspicion; unlawful searches and seizures, unlawful arrests without probable cause; accurate identification of suspects based on photos and/or physical descriptions; continued detention after discovery of exculpatory materials; detention or arrest based on a citizen's exercise of their First Amendment right to criticize and verbally protest the actions of an officer or sergeant; and execution of warrants without racial bias or discrimination, even though the need for such policies, training and supervision was obvious.

141.    Given the frequency with which officers must: determine the existence of reasonable suspicion or probable cause; conduct searches and seizures; handle exculpatory evidence; identify suspects based on photographs and/or physical descriptions; deal with criticism of their policework; and perform their duties without racial bias or discrimination, the violations of Plaintiff's First, Fourth, and Fourteenth Amendment rights were a highly predictable consequence of a failure to equip BPD officers and sergeants with the specific tools – including polices, training, and supervision – to handle such recurring situations.

142.    Further, upon information and belief, Defendant City of Brunswick learned of Defendants Osborne and Lubinsky's conduct and acquiesced to their unlawful conduct. Defendant City of Brunswick essentially ratified the conduct by not taking disciplinary action against them where their conduct had been so clearly unlawful.

143.    The aforementioned customs, policies, practices, and procedures, and the failure to properly train, investigate and discipline, and the unconstitutional approval, ratification and/or toleration of the wrongful conduct of Defendants Piekut, Makrinos, Osborne and Lubinsky were a direct and proximate cause of the deprivation of Plaintiffs' clearly established constitutional rights.

144.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiff suffered injuries and damages as set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against all Defendants awarding him compensatory and punitive damages together with all other available relief.

Respectfully submitted,


*/s/Matthew A. Dooley*
Matthew A. Dooley (0081482)
Douglas G. Walters (0093804)
**DOOLEY, GEMBALA, MCLAUGHLIN &**
**PECORA, CO., LPA**
5455 Detroit Road
Sheffield Village, Ohio 44054
Telephone:     (440) 930-4001
Facsimile:     (440) 934-7208
Email:         mdooley@dooleygembala.com
               dwalters@dooleygembala.com

*Counsel for Plaintiff*

24

## **JURY DEMAND**

Plaintiff demands a trial by jury as to all issues presented herein.

_/s/ Matthew A. Dooley_
Matthew A. Dooley (0081482)
_Counsel for Plaintiff_